UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

                          :      **INDICTMENT**

   -v.-

                          :      11 Cr. ___

GERARD CANINO,
IAN KATZ,                     :
OMAR GUZMAN,
JAMES VIGNOLA,           :      **11 CRIM 655**
HENRY RICHARDS,
ROBERT THORNTON,       :
NEAL SULTZER,
MICHAEL RAPHAN,         :
MICHAEL SCHLUSSEL,
   a/k/a "Michael Marshall,"  :
JACQUELYN TODARO,
KEVIN HYMOWITZ,         :
   a/k/a "Kevin Hymes,"
MICHAEL CHARLES,        :
RALPH DELGIORNO,
   a/k/a "R.J. Delgiorno," and  :
PANDORA BACON,

                          :

      Defendants.

- - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: AUG 0 3 2011

## COUNT ONE

### (Conspiracy to Commit Bank Fraud and Wire Fraud)

     The Grand Jury charges:

### BACKGROUND

     1.   At all times relevant to this Indictment, First

Class Equities, a/k/a Thunder Funding, a/k/a TAT Mutual Capital,

Inc. ("FCE") was a mortgage brokerage firm with offices located

either in Oceanside and/or Old Westbury, New York.  FCE was

issued a certificate by the New York State Banking Department

JUDGE PATTERSON

permitting FCE to engage in the business of a mortgage broker.
In that business, FCE received, among other things, commissions
from all the loans that were submitted to lenders through FCE,
including millions of dollars in commissions on the fraudulent
loans alleged herein.  The commissions were paid by the lenders
to FCE through the escrow accounts of closing attorneys, and were
based on a percentage of the total loan amounts.

      2.   At all times relevant to this Indictment, GERARD
CANINO, the defendant, was the President and owner of FCE.

      3.   At various times relevant to this Indictment,
IAN KATZ, the defendant, was employed by FCE as a loan officer.

      4.   At various times relevant to this Indictment,
OMAR GUZMAN, the defendant, was employed by FCE as a loan
officer.

      5.   At various times relevant to this Indictment,
JAMES VIGNOLA, was employed by FCE as a loan officer.

      6.   At various times relevant to this Indictment,
HENRY RICHARDS, the defendant, was employed by FCE as a loan
officer.

      7.   At various times relevant to this Indictment,
ROBERT THORNTON, the defendant, was employed by FCE as a loan
officer.

      8.   At all times relevant to this Indictment, NEAL
SULTZER, the defendant, was an attorney admitted to practice in

the State of New York and working under the firm name "Ackerman, Raphan & Sulzer," in an office located in Oceanside, New York.

9.   At all times relevant to this Indictment, MICHAEL RAPHAN, the defendant, was an attorney admitted to practice in the State of New York and working under the firm name "Ackerman, Raphan & Sultzer," in an office located in Oceanside, New York.

10.   At all times relevant to this Indictment, MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," was a disbarred attorney who had formerly been admitted to practice in the State of New York. At various times relevant to this Indictment, using the alias "Michael Marshall," SCHLUSSEL falsely held himself out as an attorney working with a particular attorney ("Attorney-1") at a particular firm ("Law Firm-1") in Carle Place, New York.

11.   At all times relevant to this Indictment, JACQUELYN TODARO, the defendant, was an attorney admitted to practice in the State of New York and working under the firm name "Jacquelyn Todaro, Attorney at Law" in Old Westbury, New York.

12.   At all times relevant to this Indictment, KEVIN HYMOWITZ, a/k/a "Kevin Hymes," the defendant, was an attorney admitted to practice in the State of New York.   At various times relevant to this Indictment, HYMOWITZ worked under the firm names "Kevin C. Hymowitz, P.C." and "Hymes and Associates" in the Bronx, Westchester, Queens and/or Long Island, New York.

13.   At all times relevant to this Indictment, MICHAEL

3

CHARLES, the defendant, was employed by a particular real estate title company ("Real Estate Title Company-1") in Staten Island, New York.

14.   At all times relevant to this Indictment, RALPH DELGIORNO, a/k/a "R.J. Delgiorno," the defendant, resided in various locations in Long Island, New York.

15.   At various times relevant to this Indictment, PANDORA BACON, the defendant, resided in Brooklyn, New York, and Newark, New Jersey.

### THE SCHEME TO DEFRAUD

16.   As set forth more fully below, from at least in or about 2004 through in or about 2009, GERARD CANINO, IAN KATZ, OMAR GUZMAN, JAMES VIGNOLA, HENRY RICHARDS, ROBERT THORNTON, NEAL SULTZER, MICHAEL RAPHAN, MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," JACQUELYN TODARO, KEVIN HYMOWITZ, a/k/a "Kevin Hymes," MICHAEL CHARLES, RALPH DELGIORNO, a/k/a "R.J. Delgiorno," and PANDORA BACON, the defendants, and others known and unknown, fraudulently brokered, obtained and assisted others in obtaining certain home mortgage loans from various banks and other lending institutions (the "lenders"). Through their scheme, the defendants obtained over 100 home mortgage loans on residential properties under false and fraudulent pretenses, with a total face value of over $58 million. Many of these loans are now in default and/or the properties are in foreclosure proceedings.

4

17.   In furtherance of the scheme to defraud, IAN KATZ, OMAR GUZMAN, JAMES VIGNOLA, HENRY RICHARDS, and ROBERT THORNTON, the defendants, and others known and unknown, prepared, coordinated, and submitted applications and supporting documentation for home mortgage loans containing false or misleading information, in order to induce lenders to make loans to persons to whom, and at terms on which, the lenders otherwise would not have agreed. In addition to receiving commissions through FCE on the fraudulent loans, KATZ, GUZMAN, VIGNOLA, RICHARDS, and THORNTON variously received additional fraudulent proceeds, including as set forth below.

18.   As a further part of the scheme to defraud, GERARD CANINO, IAN KATZ, and OMAR GUZMAN, the defendants, and others known and unknown, identified properties for sale in the Bronx, Brooklyn, Queens, Westchester, Dutchess County, and Long Island, New York (the "target properties").   In many instances, the defendants targeted homeowners in financial distress, in which the homeowner was having trouble making mortgage payments on the property.

19.   In furtherance of the scheme to defraud, GERARD CANINO, IAN KATZ, OMAR GUZMAN, JAMES VIGNOLA, HENRY RICHARDS, JACQUELYN TODARO, and KEVIN HYMOWITZ, a/k/a "Kevin Hymes," the defendants, and others known and unknown, recruited individuals including, but not limited to, their current and former spouses,

5

parents and other family members, acquaintances, other FCE loan officers, and each other, among others, to act as purchasers of the target properties. In fact, as the defendants well knew, these purchasers, or "straw buyers," either never intended to live in the properties and/or relinquished their interest in and control over the target properties to the defendants after the closing of the transactions. The straw purchasers were typically paid a fee in return for acting as purchasers of the properties.

20. As a further part of the scheme to defraud, in many instances, GERARD CANINO, IAN KATZ, OMAR GUZMAN, JACQUELYN TODARO, and MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," the defendants, sold or "flipped" the target properties within the same day, or within a short period of time after the initial sale, to other straw buyers.

21. As a further part of the scheme to defraud, in many instances IAN KATZ, OMAR GUZMAN, JAMES VIGNOLA, HENRY RICHARDS, and ROBERT THORNTON, the defendants, and other loan officers working for or on behalf of FCE, fraudulently improved the straw buyers' creditworthiness by falsifying certain personal and financial information about the straw buyers that was material to the lenders in their lending decisions. The defendants prepared and submitted loan applications and other documentation to the lenders purporting to accurately represent the personal and financial information of each straw buyer. In

fact, the defendants prepared and submitted false and misleading information concerning the straw buyers' employment, income, assets, and existing debt, among other things.  In support of these false and misleading representations, these defendants also created or caused to be created false documentation, such as employment and rent verifications, that the lenders relied upon to verify the statements in the loan applications.  In addition, THORNTON created additional false documents, including fake pay stubs and W-2 employment forms, to support the fraudulent loan applications submitted to lenders by the FCE loan officers.

22.   In addition to false statements concerning the straw buyers' financial profile, IAN KATZ, OMAR GUZMAN, JAMES VIGNOLA, HENRY RICHARDS, and ROBERT THORNTON, the defendants, and other loan officers working for or on behalf of FCE, falsely represented to the lenders that certain straw buyers intended to reside in the property that would secure each home mortgage loan, when, in fact, the straw buyers never intended to reside in the properties.

23.   As a further part of the scheme to defraud, at various times relevant to this Indictment, ROBERT THORNTON, the defendant, along with a nominee for GERARD CANINO, the defendant, jointly owned and controlled a particular bank account through which hundreds of thousands of dollars in proceeds of the fraud passed.

7

24.  As a further part of the scheme to defraud, in support of the fraudulent loan applications, OMAR GUZMAN, the defendant, provided false "verifications of employment," that is, statements to lenders claiming that a particular borrower was employed as stated in the borrower's loan application, in order to trick lenders into approving the fraudulent loan applications submitted on behalf of the straw buyers.

25.  As a further part of the scheme to defraud, once the home mortgage loans were approved by the lenders as a result of the defendants' fraudulent misrepresentations, the defendants caused the loan funds to be transferred to bank accounts controlled by NEAL SULTZER, MICHAEL RAPHAN, JACQUELYN TODARO, and KEVIN HYMOWITZ, a/k/a "Kevin Hymes," the defendants, and/or to a bank escrow account controlled by Attorney-1 to which MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," the defendant, had access; these defendants acted, among other things, as the closing attorneys for many of the fraudulent sales.  SULTZER, RAPHAN, TODARO, and HYMOWITZ typically received the proceeds of the mortgage loans from the lenders into their respective escrow accounts.  SULTZER and RAPHAN, who were partners, received mortgage loan proceeds into an account that they owned and controlled together (the "Sultzer and Raphan Escrow Account"). Upon receiving the loan proceeds, SULTZER, RAPHAN, SCHLUSSEL, TODARO, and HYMOWITZ wrote checks or disbursed funds, directly or

indirectly, to various members of the conspiracy and each other from the proceeds of the fraudulent sales. However, as SULTZER, RAPHAN, SCHLUSSEL, TODARO, and HYMOWITZ well knew, none of these individuals were entitled to any such monies.

26. As a further part of the scheme to defraud, in order to cover up their fraudulent disbursement of loan proceeds, NEAL SULTZER, MICHAEL RAPHAN, MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," JACQUELYN TODARO, and KEVIN HYMOWITZ, a/k/a "Kevin Hymes," the defendants, prepared and caused to be prepared sworn statements which they submitted to lenders that contained numerous false representations, as SULTZER, RAPHAN, SCHLUSSEL, TODARO, and HYMOWITZ well knew, as to how these defendants were distributing such loan proceeds.

27. As a further part of the scheme to defraud, NEAL SULTZER and MICHAEL RAPHAN, the defendants, caused fake checks, also know as "show checks," to be prepared, and copies of such fake checks to be submitted to lenders, in order to trick lenders into believing that certain monies were paid by certain parties to the transactions as deposits or downpayments toward the purchase price of the property. In truth and in fact, and as SULTZER and RAPHAN well knew, no such monies were paid by those parties.

28. As a further part of the scheme to defraud, MICHAEL CHARLES, the defendant, acted as the title closer on many

9

of the fraudulent loans, authorizing the transfer of title and causing deeds in the fraudulent transactions to be submitted to the New York City Department of Finance, Office of the City Register ("NYC Finance Department"), and other locations outside New York City, to be recorded, although as CHARLES well knew, that these transfers were being made to straw buyers in sham purchases.  In addition, in furtherance of the fraud, on many occasions, CHARLES improperly notarized documents, and deliberately omitted certain documents that CHARLES was otherwise required to provide to the title insurance company involved in the transactions.

29.  As a further part of the scheme to defraud, from time to time, after fraudulent sales were completed, GERARD CANINO and MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," the defendants, made the first several months of mortgage payments on the properties in order to lull the lenders, in the first months after closing, into thinking that the mortgages were legitimate, and thereby to conceal the true nature of the fraudulent transactions from the lenders.  Thereafter, CANINO and SCHLUSSEL stopped making payments and let the mortgages fall into default and/or let properties fall into foreclosure.

30.  As a further part of the scheme to defraud, JACQUELYN TODARO and MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," the defendants, frequently caused false and fraudulent documents

to be prepared and submitted to lenders in order to obtain second
mortgages or home equity lines of credit ("HELOCs") on the target
properties on the same day on which those properties were
purchased by the straw buyers in fraudulent sales for which
SCHLUSSEL acted as the closing attorney, or as an attorney for
one of the parties.  To do so, TODARO falsely represented, or
caused to be represented, to the second mortgage and/or HELOC
lenders that the first mortgages obtained on the properties were
a mere fraction of the true amounts that, in truth and in fact,
and as TODARO and SCHLUSSEL well knew, were actually obtained on
those properties.  Thereafter, TODARO caused the loan funds from
the fraudulently obtained second mortgage or HELOC to be
transferred to a bank account under TODARO's control, and TODARO
disbursed all or nearly all of the loan proceeds directly or
indirectly to SCHLUSSEL, GUZMAN, TODARO, other co-conspirators
not named as defendants herein, and certain straw buyers.

     31.   As a further part of the scheme to defraud, RALPH
DELGIORNO, a/k/a "R.J. Delgiorno," the defendant, acted as a
straw buyer to obtain at least 10 mortgages on target properties
within a short period in late 2006 including, among others, three
properties that DELGIORNO purchased in one day, and two
properties that DELGIORNO purchased on each of two days.  In
exchange for acting as a straw buyer on these properties within a
short period of time, DELGIORNO was paid nearly $130,000 by KEVIN

HYMOWITZ, a/k/a "Kevin Hymes," the defendant, and nearly $170,000 by GERARD CANINO, the defendant.

32.   As a further part of the scheme to defraud, PANDORA BACON, the defendant, acted as a straw buyer on the purchase of at least two target properties within a matter of weeks in 2006.   BACON also provided false verifications of employment in connection with other transactions in order to trick lenders into approving fraudulent loan applications submitted by straw buyers.   In exchange for acting as a straw buyer and providing such false verifications, BACON was paid a total of over $29,000 by GERARD CANINO, the defendant.

## FRAUD AS TO SELECTED PROPERTIES

33.   As described above, in furtherance of the conspiracy and to effect the illegal objects thereof, GERARD CANINO, IAN KATZ, OMAR GUZMAN, JAMES VIGNOLA, HENRY RICHARDS, ROBERT THORNTON, NEAL SULTZER, MICHAEL RAPHAN, MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," JACQUELYN TODARO, KEVIN HYMOWITZ, a/k/a "Kevin Hymes," MICHAEL CHARLES, RALPH DELGIORNO, a/k/a "R.J. Delgiorno," and PANDORA BACON, the defendants, and others known and unknown, purchased, caused to be purchased, or facilitated the purchase of, numerous properties, including the properties described more fully below, using residential mortgage loans obtained through fraud and deceit.

12

**690 Kildare Crescent, Seaford, New York**

34.  In or about August 2006, IAN KATZ, the defendant, recruited his wife and another close relative to act as straw buyers ("Straw Buyer-1" and "Straw Buyer-2," respectively) to purchase certain properties, including 690 Kildare Crescent, Seaford, New York, ("690 Kildare Crescent").  Among other things, KATZ promised Straw Buyer-2 that FCE would pay the mortgage on such properties during the time they were owned by Straw Buyer-2, and KATZ and GERARD CANINO, the defendant, further promised to pay Straw Buyer-2 between $30,000 and $50,000 for purchasing 690 Kildare Crescent and one other property.  In particular:

a.  On or about August 31, 2006, Straw Buyer-1 purchased 690 Kildare Crescent for $490,000 from a seller ("Seller-1").  That same day, on behalf of Straw Buyer-1, KATZ signed a deed to transfer ownership of 690 Kildare Crescent from Straw Buyer-1 to a fictitious corporate entity ("Entity-1").  MICHAEL CHARLES, the defendant, notarized the deed, which was then submitted to the county clerk's office to be recorded.

b.  Also on that same day, August 31, 2006, KATZ caused Entity-1 to sell, or "flip," 690 Kildare Crescent to Straw Buyer-2 for $615,000.  CHARLES acted as title closer for the transaction.  Among other things, CHARLES notarized the deed of transfer from Entity-1 to Straw Buyer-2, which an FCE employee signed on behalf of Entity-1, although CHARLES knew, in truth and

13

in fact, that such employee had no proper authority to sign on behalf of Entity-1.  CHARLES then caused that deed to be submitted to the county clerk's office to be recorded.  CHARLES further facilitated the fraudulent sale by omitting certain documents that were otherwise required to be submitted to the relevant title insurance company in order to transfer title of the property.

        c.    In connection with Straw Buyer-2's purchase of 690 Kildare Crescent, Straw Buyer-2 obtained home mortgage loans for the property in the amount of $615,000 from People's Choice Home Loan ("People's Choice").  Documents submitted to People's Choice by KATZ, as loan officer, in connection with Straw Buyer-2's application for the home mortgage loans contained false representations concerning, at a minimum, Straw Buyer-2's income.  The documents also falsely represented that the property would be Straw Buyer-2's primary residence when, in truth and in fact, and as KATZ well knew, Straw Buyer-2 never intended to live in the property.

        d.    NEAL SULTZER, the defendant, acted as the closing attorney on the transaction, and the funds for the loan were wired to the Sultzer and Raphan Escrow Account.  SULTZER, as the closing attorney, submitted a sworn statement to People's Choice containing false representations as to how SULTZER was distributing the loan proceeds.  Among other things, SULTZER

secretly distributed $116,792 of the loan proceeds to CANINO
through a check, which CANINO deposited, that was made out to a
co-conspirator not named as a defendant herein ("CC-1") who,
among other things, shared a bank account with CANINO (the
"CANINO-CC-1 Account").  Also from the proceeds of the sale from
Entity-1 to Straw Buyer-2, SULTZER paid out over $446,000 to
Seller-1, which represented the balance owed for the sale of the
property that day from Seller-1 to Straw Buyer-1.

       e.   On September 8, 2006, through an account
owned by Straw Buyer-1, KATZ paid Straw Buyer-2 $5000 for
purchasing 690 Kildare Crescent.

**Properties Purchased by Straw Buyer-3**

       35.  In or about September 2006, IAN KATZ, the
defendant, recruited a straw buyer ("Straw Buyer-3") to purchase
2 properties.  Among other things, KATZ offered to pay Straw
Buyer-3 $10,000 for each of the properties purchased, and
promised Straw Buyer-3 that FCE would pay the mortgage on each
property during the time it was owned by Straw Buyer-3.   In
particular:

       a.   On or about September 18, 2006, Straw Buyer-3
purchased 1051 Teller Avenue.  In connection with that purchase,
Straw Buyer-2 obtained a home mortgage loan for the property in
the amount of $470,000 from GMAC Mortgage ("GMAC"), the deposits
of which were insured by the Federal Deposit Insurance

Corporation ("FDIC").  Documents submitted to GMAC by KATZ, as loan officer, in connection with Straw Buyer-3's application for the home mortgage loans falsely overstated Straw Buyer-3's income and assets.  The documents also falsely represented that the property would be Straw Buyer-3's primary residence when, in truth and in fact, and as KATZ well knew, Straw Buyer-3 never intended to live in the property.

                b.    The funds for the loan were wired to the Sultzer and Raphan Escrow Account.  NEAL SULTZER, the defendant, acted as the closing attorney on the transaction, and submitted a sworn statement to GMAC containing false representations as to how SULTZER was distributing the loan proceeds.  Among other things, without disclosing it to GMAC, as he was required to do, SULTZER secretly distributed $90,000of the loan proceeds to GERARD CANINO, the defendant, by check to CC-1, which CANINO caused to be deposited into the CANINO-CC-1 ACCOUNT.

                c.    MICHAEL CHARLES, the defendant, acted as title closer for the transaction.  Among other things, CHARLES authorized the transfer of title, and caused the deed to be submitted to the NYC Finance Department to be recorded.

16

d.    Following the closing for 1051 Teller Avenue, CANINO paid $9375 to KATZ, and paid $10,000 to Straw Buyer-3. Thereafter, CANINO paid the mortgage on 1051 Teller Avenue for a short period of time, and then let the property fall into foreclosure.

e.    With respect to Straw Buyer-3's second purchase, on or about September 28, 2006, Straw Buyer-3 purchased 105-27 191st Street.  In connection with that purchase, Straw Buyer-3 obtained home mortgage loans for the property in the total amount of $475,000, the entire purported purchase price, from People's Choice.  Documents that KATZ, as loan officer, signed and caused to be submitted to People's Choice in connection with Straw Buyer-3's application for the home mortgage loans falsely overstated Straw Buyer-3's income and assets.  The documents also falsely represented that the property would be Straw Buyer-3's primary residence when, in truth and in fact, and as KATZ well knew, Straw Buyer-3 never intended to live in the property.

f.    The funds for the loan were wired to the Sultzer and Raphan Escrow Account.  SULTZER acted the closing attorney on the transaction, and submitted a sworn statement to People's Choice containing false representations as to how SULTZER was distributing the loan proceeds.  Among other things, without disclosing it to People's Choice, as he was required to

do, SULTZER secretly distributed $72,470 to CANINO by check to CC-1, which CANINO caused to be deposited into the CANINO-CC-1 ACCOUNT.

g.   CHARLES acted as title closer for the transaction.  Among other things, CHARLES authorized the transfer of title, and caused the deed to be submitted to the NYC Finance Department to be recorded.

h.   Following the closing for 105-27 191st Street, among other things, CANINO paid $1867 to KATZ, through a nominee, and paid $10,000 to Straw Buyer-3.  Thereafter, CANINO paid the mortgage on 105-27 191st Street for a short period of time before letting the property fall into foreclosure.

**Property Purchased by Straw Buyer-4**

36.  In or about February 2006, JACQUELYN TODARO, the defendant, recruited a straw buyer ("Straw Buyer-4") to purchase 99 DuPont Street, Brooklyn, New York ("99 Dupont Street").  In particular:

a.   On or about February 14, 2006, after being recruited by TODARO, Straw Buyer-4 purchased 99 DuPont Street. In connection with that purchase, Straw Buyer-4 obtained a home mortgage loan for the property in the amount of $670,000, the entire purported purchase price, from BNC Mortgage, Inc. ("BNC"). Documents submitted to BNC in connection with Straw Buyer-4's application for the home mortgage loans falsely overstated Straw

18

Case 1:11-cr-00655-RPP   Document 1   Filed 08/04/11   Page 19 of 46

represented, at a minimum, that the property would be Straw Buyer-4's primary residence when, in truth and in fact, Straw Buyer-4 never intended to live in the property.

      b.    The funds for the loan were wired to the Sultzer and Raphan Escrow Account. On behalf of Ackerman, Raphan & Sultzer ("ARS"), an ARS employee ("ARS Employee-1"), acted as the settlement agent on the transaction and submitted a sworn statement to BNC containing false representations as to how the loan proceeds were being distributed. Among other things, without disclosing it or causing it to be disclosed to BNC, as he was required to do, MICHAEL RAPHAN, the defendant, secretly distributed $2240 of the loan proceeds to himself; $67,000 of the loan proceeds to TODARO; $9256 of the loan proceeds to GERARD CANINO, the defendant, by check to CC-1, which CANINO deposited into the CANINO-CC-1 ACCOUNT; and $10,000 to the seller for agreeing to participate in the fraudulent sale.

      c.    MICHAEL CHARLES, the defendant, acted as title closer for the transaction. Among other things, CHARLES authorized the transfer of title, and caused the deed to be submitted to the NYC Finance Department to be recorded.

      d.    Following the fraudulent sale of 99 DuPont Street, CANINO, among other things, paid $2500 to Straw Buyer-4.

      e.    On or about November 23, 2009, TODARO and

MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," the defendant,
caused Straw Buyer-4 to sell 99 DuPont Street, in a "short sale"
(i.e., a sale for which the lender holding the outstanding
mortgage on the property agrees to accept less than the mortgage
balance in full satisfaction of the mortgage) for $300,000 to a
shell corporation owned and controlled by SCHLUSSEL ("Entity-2").
Thereafter, on December 30, 2009, SCHLUSSEL caused Entity-2 to
transfer title on 99 DuPont Street to a separate shell
corporation for which TODARO was the registered agent.
Thereafter, TODARO and SCHLUSSEL proceeded to cause additional
mortgage loans to be taken out on the property based on false
representations.

**Properties Purchased by Straw Buyer-5**

      37.   In or about late 2005, HENRY RICHARDS, NEAL
SULTZER, GERARD CANINO, and MICHAEL CHARLES, the defendants,
purchased, caused to be purchased, and facilitated a straw
buyer's purchase of 117-37 193d Street, Queens, New York, ("117-
37 193d Street") and 2457 Glebe Avenue, Bronx, New York ("2457
Glebe Avenue"), through fraud and deceit.  In particular:

      a.   In or about late 2005, RICHARDS recruited a
straw buyer ("Straw Buyer-5") to purchase two properties.  Among
other things, RICHARDS claimed to Straw Buyer-5, in sum and
substance, that the properties would be held in Straw Buyer-5's
name for one year, after which time the properties would be

repurchased by the sellers or sold to third parties.   RICHARDS
promised to pay Straw Buyer-5 $10,000 for each of the two
properties purchased.

        b.    On or about November 21, 2005, Straw Buyer-5
purchased 2457 Glebe Avenue.   In connection with that purchase,
Straw Buyer-5 obtained home mortgage loans for the property in
the amount of $455,000, the entire purported purchase price, from
Long Beach Mortgage ("Long Beach").   Documents that RICHARDS, as
loan officer, caused to be submitted in connection with Straw
Buyer-5's application for the home mortgage loans falsely
overstated Straw Buyer-5's income and assets.   The documents also
falsely represented that the property would be Straw Buyer-5's
primary residence when, in truth and in fact, and as RICHARDS
well knew, Straw Buyer-5 never intended to live in the property.

        c.    The funds for the loan were wired to the
Sultzer and Raphan Escrow Account.   On behalf of ARS, ARS
Employee-1 acted as the settlement agent on the transaction, and
submitted a sworn statement to Long Beach containing false
representations as to how the loan proceeds were being
distributed.   Among other things, without disclosing it to Long
Beach, as he was required to do, SULTZER secretly distributed
$39,820 to another individual who, in turn, provided $39,842 to
CANINO shortly thereafter.

d.   CHARLES acted as title closer for the
transaction.   Among other things, CHARLES authorized the transfer
of title, and caused the deed to be submitted to the NYC Finance
Department to be recorded.

e.   Following the closing for 2457 Glebe Avenue,
CANINO paid $10,000 to Straw Buyer-5.   Thereafter, CANINO paid
the mortgage on 2457 Glebe Avenue for a short period of time and
then stopped paying the mortgage.

f.   With respect to Straw Buyer-5's second
purchase, on or about December 22, 2005, Straw Buyer-5 purchased
117-37 193d Street.   In connection with that purchase, Straw
Buyer-5 obtained home mortgage loans for the property in the
total amount of $390,000, the entire purported purchase price,
from BNC.   Documents that RICHARDS, as loan officer, caused to be
submitted to BNC in connection with Straw Buyer-5's application
for the home mortgage loans falsely overstated Straw Buyer-5's
income, assets, and debt.   The documents also falsely represented
that the property would be Straw Buyer-5's primary residence
when, in truth and in fact, and as RICHARDS well knew, Straw
Buyer-5 never intended to live in the property.

g.   The funds for the loan were wired to the
Sultzer and Raphan Escrow Account.   RAPHAN acted as the closing
attorney on the transaction, and submitted a sworn statement to
Long Beach containing false representations as to how RAPHAN was

22

distributing the loan proceeds.  Among other things, without
disclosing it to BNC, as he was required to do, RAPHAN secretly
distributed $107,073 of the loan proceeds to CANINO by check to
CC-1, which CANINO deposited into the CANINO-CC-1 Account.

        h.    CHARLES acted as title closer for the
transaction.  Among other things, CHARLES authorized the transfer
of title, and caused the deed to be submitted to the NYC Finance
Department to be recorded.

        I.    Following the closing for 117-37 193d Street,
from the CANINO-CC-1 Account, CANINO paid $10,000 to Straw Buyer-
5; paid approximately $29,000 to RICHARDS in three checks written
to a nominee on RICHARDS's behalf; and paid over $1800 in two
checks written directly to RICHARDS.  Thereafter, CANINO paid the
mortgage on 117-37 193d Street for a short period of time, and
then stopped paying the mortgage.

**Property Purchased by Straw Buyer-6**

        38.  In or about June 2008, GERARD CANINO, ROBERT
THORNTON, MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," OMAR
GUZMAN, and MICHAEL CHARLES, working with a co-conspirator not
named as a defendant herein ("CC-2"), purchased, caused to be
purchased, and facilitated a straw buyer's purchase of 1722
Porter Place in North Bellmore, New York ("1722 Porter Place")
through fraud and deceit.  In particular:

        a.    In or about June 2008, a straw buyer ("Straw

Buyer-6") purchased 1722 Porter Place from another straw buyer, a corporation owned and controlled by CANINO.  In connection with that purchase, Straw Buyer-6 obtained a home mortgage loan for the property in the amount of $230,000 from J.P. Morgan Chase Bank ("Chase"), the deposits of which were insured by the FDIC. Documents submitted to Chase by FCE in connection with Straw Buyer-6's application for the home mortgage loans falsely stated Straw Buyer-6's income and employment by falsely claiming that Straw Buyer-6 earned over $12,600 per month at a particular company ("Entity-3") which, in truth and in fact, was a bogus company used by GUZMAN to provide false verifications of employment in furtherance of the scheme.  GUZMAN did, in fact, cause a false verification of employment, using the Entity-3 name, to be provided to Chase in support of Straw Buyer-6's loan application.

> b.   The funds for the loan were wired from Chase to an escrow account at Capital One Bank in North Fork, New York, which was owned and controlled by Attorney-1, but from which Attorney-1 had provided blank checks for SCHLUSSEL to use at closing to disburse the loan proceeds.  SCHLUSSEL, who had previously been disbarred and was not licensed to practice as an attorney, acted as the closing attorney on behalf of Attorney-1 on the transaction, and submitted a sworn statement to Chase containing false representations as to how the loan proceeds were

being distributed.  Among other things, without disclosing it to
Chase, as he was required to do, SCHLUSSEL secretly distributed
$78,146 to THORNTON (the "$78,146 Proceeds"); an additional $3000
by separate check to THORNTON; $127,355 to Entity-2 which, as set
forth above, was owned and controlled by SCHLUSSEL; an additional
$3696 to a separate shell corporation owned and controlled by
SCHLUSSEL ("Entity-4"); $10,000 to CC-2; $2500 to Attorney-1; and
additional money to one or more individuals not named as
defendants herein.

      c.   CHARLES acted as title closer for the
transaction.  Among other things, CHARLES authorized the transfer
of title, and caused the deed to be submitted to the county
clerk's office to be recorded.  CHARLES also omitted certain
documents he was otherwise required to provide regarding the
corporate seller to the title insurance company involved in the
transaction.

      d.   On or about the date of the closing for 1722
Porter Place, THORNTON provided the $78,146 Proceeds to GUZMAN by
check to a particular shell corporation that GUZMAN controlled;
and SCHLUSSEL provided $83,146 to CANINO by check from the bank
account of Entity-2.

**Properties Purchased by Straw Buyer-7**

      39.  In or about late 2005, JAMES VIGNOLA, the
defendant, recruited a straw buyer ("Straw Buyer-7") to purchase

three properties.  VIGNOLA informed Straw Buyer-7, in sum and
substance, and among other things, that FCE would receive and pay
the mortgage bills and taxes on such properties.  In particular:

        a.     On or about September 6, 2005, Straw Buyer-7
purchased 44 North Clinton Street, Poughkeepsie, New York ("44
North Clinton Street").  On or about November 2, 2005, Straw
Buyer-7 purchased 417 Nuber Avenue ("417 Nuber Avenue"), Mt.
Vernon, New York.  On or about October 28, 2005, Straw Buyer-7
purchased 2414 Second Street, East Meadow, New York ("2414 Second
Street").  In connection with the purchase of each property,
Straw Buyer-7 obtained home mortgage loans in the amount of the
entire purported purchase price, as follows: $225,250 in mortgage
loans from Aurora Bank for 44 North Clinton Street; $387,600 in
mortgage loans from WMC Mortgage Corp. ("WMC") for 417 Nuber
Avenue, and $525,000 in mortgage loans from BNC for 2414 Second
Street (these lenders, collectively, the "Straw Buyer-7
Lenders").

        b.  Documents submitted to the Straw Buyer-7
Lenders for Straw Buyer-7's respective applications for the home
mortgage loans contained false representations as to Straw Buyer-
7's income and employment.  The documents for each property also
falsely represented that such property would be Straw Buyer-7's
primary residence when, in truth and in fact, and as VIGNOLA well
knew, Straw Buyer-7 never intended to live in any of the

properties.

c.    In connection with Straw Buyer-7's purchases of the properties, GERARD CANINO, the defendant, paid Straw Buyer-7 $18,500.  In addition, CANINO paid VIGNOLA over $4,400 in fraud proceeds from the Canino-CC-1 Account for recruiting Straw Buyer-7 to purchase 417 Nuber Avenue.

d.    In connection with other properties purchased by other straw buyers recruited by VIGNOLA and for whom VIGNOLA acted as the loan officer, between November 2005 and August 2006, CANINO paid VIGNOLA over $24,000 in additional fraud proceeds from the Canino-CC-1 Account.

**Property Purchased by Straw Buyer-8**

40.    In or about June 2008, OMAR GUZMAN, the defendant, recruited a straw buyer ("Straw Buyer-8") to purchase 2106 Strauss Street ("2106 Strauss Street"), Brooklyn, New York. Among other things, GUZMAN promised to pay Straw Buyer-8 $5,000 for purchasing the property, and promised to pay the mortgage on the property during the time it was owned by Straw Buyer-8.  In particular:

a.    On or about June 27, 2008, Straw Buyer-8 purchased 2106 Strauss Street from another straw buyer ("Straw Buyer-9") at a closing attended by GUZMAN, among others.  At or about the time of the closing, GUZMAN caused Straw Buyer-9 to execute a deed to transfer ownership of 2106 Strauss Street to a

27

particular shell corporation ("Entity-5"), which was controlled
by GUZMAN.  Straw Buyer-8 was represented in the transaction by
MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," purportedly on
behalf of Attorney-1.

       b.  Also on June 27, 2008, GUZMAN caused Entity-5
to sell 2106 Strauss Street to Straw Buyer-8.  In connection with
that purchase, Straw Buyer-8 obtained home mortgage loans for the
property in the amount of $450,000 from Emigrant Mortgage Company
("Emigrant") (the "Emigrant Loan"), the deposits of which were
insured by the FDIC.  Documents that CC-2 caused to be submitted
to Emigrant in connection with Straw Buyer-8's application for
the home mortgage loans falsely stated Straw Buyer-8's debts,
falsely stated that Straw Buyer-8 was currently renting a home,
and falsely stated that the property would be Straw Buyer-8's
primary residence, when in truth and in fact, and as GUZMAN well
knew, Straw Buyer-8 never intended to live in the property.

       c.  Also on June 27, 2008, JACQUELYN TODARO, the
defendant, caused a HELOC to be obtained on 2106 Strauss Street
in the amount of $250,000 from Chase by, among other things,
causing a document to be provided to Chase that falsely
represented that the Emigrant Loan obtained that day was only in
the amount of $200,000 when, in truth and in fact, and as TODARO
well knew, the Emigrant Loan was in the amount of $450,000.  The
HELOC proceeds were wired to a bank account controlled by TODARO

(the "Todaro Escrow Account"), who acted as the closing attorney for the transaction, and who submitted a sworn statement to Chase that contained false representations as to how TODARO was distributing the HELOC proceeds.  Among other things, without disclosing it to Chase, as she was required to do, TODARO secretly distributed, from the HELOC proceeds, $15,000 to Straw Buyer-9; $47,600 to SCHLUSSEL by check to Entity-2; $5000 to TODARO; $5000 to SCHLUSSEL by check to "Michael Marshall"; and $5638 to GUZMAN by check to Entity-5.

## Properties Purchased by DELGIORNO

41.    In or about 2006, ROBERT DELGIORNO, a/k/a "R.J. Delgiorno," the defendant, acted as a straw buyer to obtain at least 10 mortgages on properties through FCE within a short period of time.  In particular:

a.    On or about July 13, 2006, DELGIORNO purchased, from another straw buyer, 120 Lawson Ave, East Rockaway, New York ("120 Lawson Avenue"), for $349,000.  On or about October 16, 2006,  DELGIORNO purchased, from other straw buyers, properties at 2683 South St. Marks Avenue, Bellmore, New York ("2683 South St. Marks Avenue"), for $740,000; 2414 Second Street, East Meadow, New York ("2414 Second Street") for $595,000; and 417 Nuber Avenue, Mount Vernon, New York ("417 Nuber Avenue") for $515,000, respectively.  On or about October 20, 2006, DELGIORNO purchased, from other straw buyers,

29

properties at 221 Frankel Avenue, Merrick, New York ("221 Frankel Avenue"), for $865,000, and 691 Broadway Avenue ("691 Broadway Avenue"), Brentwood, New York, for $410,000, respectively.  On or about November 1, 2006, DELGIORNO purchased, from another straw buyer, 368 Frankel Boulevard, Merrick, New York ("368 Frankel Boulevard"), for $950,000.  On or about November 8, 2006, DELGIORNO purchased, from another straw buyer, 30 Sherrard Street, East Hills, New York ("30 Sherrard Street"), for $865,000.  On or about November 9, 2006, DELGIORNO took out another mortgage on 120 Lawson Avenue in a mortgage refinance transaction ("Refinance of 120 Lawson Avenue") for $432,000, and purchased, from another straw buyer, 55 East Hudson Street, Long Beach, New York ("55 East Hudson Street"), for $600,000 (collectively, the "DELGIORNO Properties").

  b.   DELGIORNO obtained mortgage loans for the full purported purchase price of each of the DELGIORNO Properties, and each DELGIORNO Property was financed with mortgage loans from a different lender.  In particular, DELGIORNO obtained mortgage loans from the following lenders for the full purported purchase price set forth above for the following properties: BNC (120 Lawson Avenue); Fremont Investment & Loan ("Fremont") (2683 South St. Marks Avenue); Novastar (2414 Second Street); First Franklin (417 Number Avenue); People's Choice (221 Frankel Avenue); Resmae Mortgage Corporation (691 Broadway

Avenue); First Magnus Financial (368 Frankel Boulevard); Opteum
Financial Services (30 Sherrard Street); Morgan Stanley/West
Coast Realty Services, Inc. (Refinance of 120 Lawson Avenue); and
First Rate Capital Corporation (55 East Hudson Street)
(collectively, the "DELGIORNO Lenders").

        c.    Among other things, the documents submitted
to the DELGIORNO Lenders for the respective DELGIORNO Properties
falsely stated DELGIORNO's income and debt, and falsely stated
that the property would be the borrower's primary residence, when
in truth and in fact, DELGIORNO never intended to live in any of
the DELGIORNO Properties.

        d.    Funds for the purchase of 2414 Second Street,
691 Broadway Avenue, 221 Frankel Avenue, 368 Frankel Boulevard,
30 Sherrard Street, and 417 Nuber Avenue ("the ARS-DELGIORNO
Transactions") were wired to the Sultzer and Raphan Escrow
Account. NEAL SULTZER, the defendant, acted as the closing
attorney for the each of the ARS DELGIORNO Transactions, except
for 691 Broadway and 417 Nuber Avenue, for which MICHAEL RAPHAN,
the defendant, acted as the closing attorney. For each of the
ARS DELGIORNO Transactions for which he acted as closing
attorney, SULTZER submitted a sworn statement to the applicable
lender containing false representations as to how SULTZER was
distributing the loan proceeds. For each of the ARS DELGIORNO
Transactions for which he acted as closing attorney, RAPHAN

submitted a sworn statement to the applicable lender containing false representations as to how RAPHAN was distributing the loan proceeds.

e.   MICHAEL CHARLES, the defendant, acted as title closer, authorizing the transfer of title, and causing the deed to be submitted to the county clerk's office to be recorded, for DELGIORNO's purchase of each of the following DELGIORNO Properties: 417 Nuber Avenue and 2414 Second Street (purchased on the same day, as set forth above); 221 Frankel Avenue and 691 Broadway Avenue (purchased on the same day, as set forth above); 368 Frankel Boulevard; and 55 East Hudson Street (collectively, the "CHARLES-DELGIORNO Transactions").  At the closing for one of the CHARLES-DELGIORNO Transactions, which DELGIORNO did not attend, CC-2 signed, in CHARLES's presence, DELGIORNO's name on DELGIORNO's behalf on documents that CHARLES proceeded to notarize.

f.   With respect to DELGIORNO's purchase of 2683 South St. Marks Avenue, the funds for the loan were wired to a bank account owned and controlled by KEVIN HYMOWITZ, a/k/a "Kevin Hymes," the defendant (the "Hymowitz Escrow Account"). Hymowitz's employee, ("Hymowitz Employee-1") acted as the settlement agent for the transaction, and submitted a sworn statement to Fremont containing false representations as to how the loan proceeds were being distributed, including, but not

32

limited to, the false representation that $32,518 was being distributed to the seller of the property. In addition, without disclosing it or causing it to be disclosed to Fremont, as he was required to do, HYMOWITZ, among other things, secretly distributed $26,780 to GERARD CANINO, the defendant, by check to CC-1, which CANINO deposited into the CANINO-CC-1 Account, and $62,178 to DELGIORNO.

g. With respect to DELGIORNO's purchase of 120 Lawson Avenue, the funds for the loan were wired to the Hymowitz Escrow Account. Hymowitz Employee-1 acted as the settlement agent for the transaction, and submitted a sworn statement to BNC containing false representations as to how HYMOWITZ was distributing the loan proceeds. Among other things, without disclosing it to BNC, as he was required to do, on July 19, 2006, HYMOWITZ secretly distributed $67,750 to DELGIORNO.

h. In addition to receiving nearly $130,000 in fraud proceeds from HYMOWITZ, as set forth above, in exchange for acting as a straw buyer as set forth herein, between October 3, 2006, and November 7, 2006, DELGIORNO received nearly $170,000 in a series of payments from CANINO.

**Properties Purchased by BACON, and BACON's False Verifications of Employment**

42. In or about mid-2006, PANDORA BACON, the defendant, acted as a straw buyer on two properties. In particular:

33

a.   On or about April 20, 2006, BACON purchased
286 Light Street, Bronx, New York ("286 Light Street").   On or
about May 4, 2006, BACON purchased 1130 Elizabeth Street,
Baldwin, New York ("1130 Elizabeth Street").   In connection with
the purchase of 286 Light Street, BACON obtained home mortgage
loans for the property in the amount of $342,000 from BNC.   In
connection with the purchase of 1130 Elizabeth Street, BACON
obtained home mortgage loans for the property in the amount of
$632,000 from WMC.   Documents that JAMES VIGNOLA, the defendant,
caused to be submitted to BNC and WMC for BACON's respective
applications for the home mortgage loans contained false
representations as to BACON's income and employment.   The
documents for each property also falsely represented that such
property would be BACON's primary residence when, in truth and in
fact, as VIGNOLA well knew, BACON never intended to live in
either property.

b.   Following BACON's purchase of the two
properties, GERARD CANINO, the defendant, paid the mortgage on
each property for a short period of time.   Subsequently, CANINO
let both properties fall into foreclosure.

c.   In addition, in or about 2006, BACON provided
false verifications of employment in connection with the purchase
of at least 4 properties by various straw buyers through FCE (the
"Bacon False VOE Properties"), in order to trick lenders into

34

believing that false representations made in those straw buyers' loan applications regarding the straw buyers' employment were true.  In particular, in connection with the purchase of each of the Bacon False VOE Properties, BACON provided information to the applicable lender falsely "verifying" that the borrower in the transaction worked for BACON's company which, in truth and in fact, and as BACON well knew, was merely a shell corporation used by BACON for the purpose, among other things, of providing such false verifications of employment.

d.   In total, CANINO paid BACON over $29,000 for acting as a straw buyer and providing the false verifications of employment on the Bacon False VOE Properties.  BACON received such payment through a series of checks from CANINO, including in certain checks written to "Pandora Bacon" in the amounts of $300, $900, and $5000, dated August 24, 2006, September 13, 2006, and June 5, 2006, respectively (the "Three Canino Checks").

## STATUTORY ALLEGATIONS

43.   From at least in or about 2004, through in or about 2009, in the Southern District of New York and elsewhere, GERARD CANINO, IAN KATZ, OMAR GUZMAN, JAMES VIGNOLA, HENRY RICHARDS, ROBERT THORNTON, NEAL SULTZER, MICHAEL RAPHAN, MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," JACQUELYN TODARO, KEVIN HYMOWITZ, a/k/a "Kevin Hymes," MICHAEL CHARLES, RALPH DELGIORNO, a/k/a "R.J. Delgiorno," and PANDORA BACON, the defendants, and

others known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit wire fraud and bank fraud, in violation of Sections 1343
and 1344 of Title 18, United States Code.

    44.  It was a part and an object of the conspiracy that
GERARD CANINO, IAN KATZ, OMAR GUZMAN, JAMES VIGNOLA, HENRY
RICHARDS, ROBERT THORNTON, NEAL SULTZER, MICHAEL RAPHAN, MICHAEL
SCHLUSSEL, a/k/a "Michael Marshall," JACQUELYN TODARO, KEVIN
HYMOWITZ, a/k/a "Kevin Hymes," MICHAEL CHARLES, RALPH DELGIORNO,
a/k/a "R.J. Delgiorno," and PANDORA BACON, the defendants, and
others known and unknown, willfully and knowingly, having devised
and intending to devise a scheme and artifice to defraud, and for
obtaining money and property by means of false and fraudulent
pretenses, representations, and promises, would and did transmit
and cause to be transmitted by means of wire and radio
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of executing
such scheme and artifice, in violation of Title 18, United States
Code, Section 1343.

    45.  It was further a part and an object of the
conspiracy that GERARD CANINO, IAN KATZ, OMAR GUZMAN, JAMES
VIGNOLA, HENRY RICHARDS, ROBERT THORNTON, NEAL SULTZER, MICHAEL
RAPHAN, MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," JACQUELYN
TODARO, KEVIN HYMOWITZ, a/k/a "Kevin Hymes," MICHAEL CHARLES,

RALPH DELGIORNO, a/k/a "R.J. Delgiorno," and PANDORA BACON, the
defendants, and others known and unknown, willfully and
knowingly, would and did execute a scheme and artifice to defraud
financial institutions, the deposits of which were then insured
by the Federal Deposit Insurance Corporation, and to obtain
moneys, funds, credits, assets, securities, and other property
owned by, and under the custody and control of, such financial
institutions, by means of false and fraudulent pretenses,
representations, and promises, in violation of Title 18, United
States Code, Section 1344.

## OVERT ACTS

46.   In furtherance of the conspiracy and to effect the
illegal objects thereof, GERARD CANINO, IAN KATZ, OMAR GUZMAN,
JAMES VIGNOLA, HENRY RICHARDS, ROBERT THORNTON, NEAL SULTZER,
MICHAEL RAPHAN, MICHAEL SCHLUSSEL, a/k/a "Michael Marshall,"
JACQUELYN TODARO, KEVIN HYMOWITZ, a/k/a "Kevin Hymes," MICHAEL
CHARLES, RALPH DELGIORNO, a/k/a "R.J. Delgiorno," and PANDORA
BACON, the defendants, and others known and unknown, committed
the following overt acts, among others, in the Southern District
of New York and elsewhere:

a.   On or about October 23, 2005, CANINO caused a
check written to CANINO for $87,086 in fraudulent proceeds to be
deposited into a bank account controlled by CANINO.

b.   On or about September 6, 2006, KATZ signed a

37

loan application for Straw Buyer-3 in connection with the purchase of 1051 Teller Avenue.

        c.  On or about July 29, 2008, GUZMAN caused a check from TODARO for $5638 of the proceeds of a fraudulent loan to be deposited into a bank account controlled by GUZMAN.

        d.  On or about January 26, 2007, VIGNOLA caused a loan application to be submitted to a lender for Straw Buyer-7 in connection with the purchase of 44 North Clinton Street.

        e.  On or about December 15, 2005, RICHARDS signed a loan application for Straw Buyer-5 in connection with the purchase of 117-37 193rd Street.

        f.  On or about June 8, 2008, THORNTON signed a check written to a company controlled by GUZMAN for $78,146 in fraudulent proceeds.

        g.  On or about April 5, 2007, SULTZER wrote a check to CC-1 in the amount of $90,000 from the proceeds of the sale of 1051 Teller Avenue, Bronx, New York.

        h.  On or about February 14, 2006, RAPHAN caused a check in the amount of $67,000 to be written from the proceeds of the sale of 99 Dupont Street and provided to TODARO.

        I.  On or about April 23, 2007, SCHLUSSEL wrote a check to Entity-2 for $127,355 from the proceeds of a fraudulent loan.

        j.  On or about June 27, 2008, TODARO wrote a

38

check to Entity-2 for $47,600 from the proceeds of a fraudulent loan.

        k.   On or about April 23, 2007, HYMOWITZ wrote a check to CANINO for $66,874.03 from the proceeds of a fraudulent loan.

        l.   On or about October 5, 2006, DELGIORNO deposited a check for $15,000 that he received from CANINO.

        m.   On or about October 31, 2006, CHARLES notarized a deed for the transfer of title to 690 Kildare Crescent from Entity-1 to Straw Buyer-2.

        n.   On or about August 21, 2006, BACON provided a false verification of employment in support of a straw buyer's loan application.

        (Title 18, United States Code, Section 1349.)

## COUNT TWO

### (Bank Fraud re: 1051 Teller Street, Bronx, New York)

        The Grand Jury further charges:

        47.  The allegations set forth in paragraphs 1 through 42 and 46 of this Indictment are re-alleged as if set forth herein in full.

        48.  In or about September 2006, in the Southern District of New York and elsewhere, GERARD CANINO, IAN KATZ, NEAL SULTZER, and MICHAEL CHARLES, the defendants, willfully and knowingly did execute, and attempt to execute, a scheme and

artifice to defraud a financial institution, the deposits of
which were then insured by the Federal Deposit Insurance
Corporation, and to obtain moneys, funds, credits, assets,
securities, and other property owned by, and under the custody
and control of, such financial institution, by means of false and
fraudulent pretenses, representations and promises, to wit,
CANINO, KATZ, SULTZER, CHARLES and others participated in a
scheme to defraud GMAC Mortgage by obtaining home mortgage loans
totaling approximately $470,000, through the use of false
statements, for the purchase of a property at 1051 Teller Street,
Bronx, New York.

    (Title 18, United States Code, Sections 1344 and 2.)

## COUNT THREE

### (Bank Fraud re: 44 North Clinton Street, Poughkeepsie, New York)

    The Grand Jury further charges:

    49.   The allegations set forth in paragraphs 1 through
42 and 46 of this Indictment are re-alleged as if set forth
herein in full.

    50.   In or about August 2006, in the Southern District
of New York and elsewhere, GERARD CANINO and JAMES VIGNOLA, the
defendants, willfully and knowingly did execute, and attempt to
execute, a scheme and artifice to defraud a financial
institution, the deposits of which were then insured by the
Federal Deposit Insurance Corporation, and to obtain moneys,

funds, credits, assets, securities, and other property owned by, and under the custody and control of, such financial institution, by means of false and fraudulent pretenses, representations and promises, to wit, CANINO, VIGNOLA and others participated in a scheme to defraud Aurora Bank by obtaining home mortgage loans totaling approximately $225,250, through the use of false statements, for the purchase of property at 44 North Clinton Street, Poughkeepsie, New York.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT FOUR

### (False Statements in a Matter Within the Jurisdiction of the Executive Branch: GUZMAN)

The Grand Jury further charges:

51.  The allegations set forth in paragraphs 1 through 42 and 46 are repeated and realleged as if set forth fully herein.

52.  On or about September 28, 2010, in the Southern District of New York, OMAR GUZMAN, the defendant, willfully and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, falsified, concealed, and covered up by trick, scheme, and device a material fact, and made a materially false, fictitious, and fraudulent statement and representation, and made and used a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, to wit, GUZMAN

41

falsely and fraudulently stated to agents of the Federal Bureau of Investigation that GUZMAN never used straw buyers to obtain mortgage loans.

(Title 18, United States Code, Section 1001.)

## COUNT FIVE

**(False Statements in a Matter Within
the Jurisdiction of the Executive Branch: BACON)**

The Grand Jury further charges:

53.   The allegations set forth in paragraphs 1 through 42 and 46 are repeated and realleged as if set forth fully herein.

54.   On or about ~~September 28, 2010~~ April 15, 2011, in the Southern District of New York, PANDORA BACON, the defendant, willfully, and knowingly, in a matter within the jurisdiction of the executive branch of the Government of the United States, falsified, concealed, and covered up by trick, scheme, and device a material fact, and made a materially false, fictitious, and fraudulent statement and representation, and made and used a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry, to wit, BACON falsely and fraudulently stated to agents of the Federal Bureau of Investigation that BACON had never received or deposited any of the Three Canino Checks, namely, checks written to "Pandora Bacon" dated June 5, 2006, August 24, 2006, and

September 13, 2006, in the amounts of $5000, $300, and $900, respectively.

(Title 18, United States Code, Section 1001.)

## FORFEITURE ALLEGATIONS

55. As a result of committing one or more of the offenses alleged in Counts One, Two and Three of this Indictment, GERARD CANINO, IAN KATZ, OMAR GUZMAN, JAMES VIGNOLA, HENRY RICHARDS, ROBERT THORNTON, NEAL SULTZER, MICHAEL RAPHAN, MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," JACQUELYN TODARO, KEVIN HYMOWITZ, a/k/a "Kevin Hymes," MICHAEL CHARLES, RALPH DELGIORNO, a/k/a "R.J. Delgiorno," and PANDORA BACON, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982, any property constituting or derived from proceeds obtained directly or indirectly as a result of the said offenses, including, but not limited to, at least $58 million, a sum of money representing the amount of proceeds obtained as a result of the said offenses, for which the defendants are jointly and severally liable.

56. As a result of committing the bank fraud and wire fraud conspiracy offense alleged in Count One of this Indictment, GERARD CANINO, IAN KATZ, OMAR GUZMAN, JAMES VIGNOLA, HENRY RICHARDS, ROBERT THORNTON, NEAL SULTZER, MICHAEL RAPHAN, MICHAEL SCHLUSSEL, a/k/a "Michael Marshall," JACQUELYN TODARO, KEVIN HYMOWITZ, a/k/a "Kevin Hymes," MICHAEL CHARLES, RALPH DELGIORNO,

43

a/k/a "R.J. Delgiorno," and PANDORA BACON, the defendants, shall further forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(c), and Title 28, United States Code, Section 2461, any property constituting or derived from proceeds obtained directly or indirectly as a result of the said offense, including, but not limited to, at least $58 million, a sum of money representing the amount of proceeds obtained as a result of the said offense, for which the defendants are jointly and severally liable.

### SUBSTITUTE ASSET PROVISION

57.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

  a.   cannot be located upon the exercise of due diligence;

  b.   has been transferred or sold to, or deposited with, a third person;

  c.   has been placed beyond the jurisdiction of the Court;

  d.   has been substantially diminished in value; or

  e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any

44

other property of the defendants up to the value of the above

forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)


FOREPERSON                              PREET BHARARA
                                        United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

GERARD CANINO,
IAN KATZ,
OMAR GUZMAN,
JAMES VIGNOLA,
HENRY RICHARDS,
ROBERT THORNTON,
NEAL SULTZER,
MICHAEL RAPHAN,
MICHAEL SCHLUSSEL,
a/k/a "Michael Marshall,"
JACQUELYN TODARO,
KEVIN HYMOWITZ,
a/k/a "Kevin Hymes,"
MICHAEL CHARLES,
RALPH DELGIORNO,
a/k/a "R.J. Delgiorno," and
PANDORA BACON,

Defendants.

INDICTMENT

11 Cr. ____

(18 U.S.C. §§ 1349, 1344, and 2.)

PREET BHARARA
United States Attorney.

A TRUE BILL

_Linda Gafay_
Foreperson.

8/3/11   Fld. superseeding
Indictment Arrest warrants issued
Pitman, MJ